Hoeace Maynard, Special J.,
delivered the opinion of the Court.
Evan Evans died intestate, in G-reene County, the 15th of March, 1858, leaving, as his heirs and dis-tributees, three sons, a daughter, aind the children of a daughter, deceased. His estate was a farm of two hundred acres, and personal property.
This bill was filed on the 19th of June, 1858, by one of the sons, and the living daughter and her husband, against the other two sons and the children of the deceased daughter. The complainants allege that the estate is in the hands of one of the sons, who is made defendant; that he refuses to administer upon it, .and, as they are informed, is unwilling any one else should do so. They pray the Chancery Court to appoint an administrator; and one Eay was accordingly appointed.
The complainants further allege, that in the year 1845, a brother, Jonathan Evans, died in the State of Indiana, intestate, unmarried, and without issue, having a personal estate, to a considerable amount, in the hands of his father and of his two brothers, the defendants; and ask that an • administrator be appointed *145 upon his estate, also. This, however, was not done. A demurrer was interposed, and disallowed.
This bill should have been dismissed upon demurrer. The Code had gone into effect, and become the law of the State, on the 1st tíf May, previous to the filing of the bill. It provides, that, “The Chancery Court of the district, in which any person resided at the time of his death, or in which his estate, goods, and chattels, or effects, were, at the time of his death, may appoint an administrator, where six months have elapsed from the death, and no person will -apply, or can he procured, to administer on his estate.
“To this end, the next of kin, or any creditor of the deceased, may file his bill in the Chancery Court of said, district, setting forth the facts of the case, ánd that no person can be procured to administer on the estate, agreeably to the laws in force, and praying that an administrator be appointed, with such other specific prayers as are required, and for general relief.
“ Such bill, if filed by a creditor, shall be on behalf of all other creditors, who may wish to come in and be made parties on the usual terms; and the distributees and heirs may be made parties defendant.
“ If the bill is filed by. the next of kin, or any of them, it shall be on behalf of all the distributees and heirs, against the creditors, who may become defendants.
“The administration of such estate, shall be conducted under the authority of the Chancery Court, in *146 the same manner, and under the same rules, as the administration of an insolvent estate.”
Under this law, these proceedings were evidently instituted and conducted, and they show a total misapplication of it. It was not designed to transfer the probate jurisdiction of the County Court, to the Chancery Court, at the pleasure of the parties interested; nor to give the Chancery Court a concurrent general jurisdiction with the County Court, in the administration and settlement of estates;, hut to provide a remedy in exceptional cases, where the condition of the estate was so forbidding, as to deter every one from accepting the administration, upon the ordinary terms of the law. It contemplates only controversies between the heirs and distributees, on the one hand, and the creditors on- the other, and allows either party to come into the Chancery Court, after the lapse of six months from the death of the intestate, if no person can be otherwise procured, to administer upon the estate. In this case, there are no creditors; the controversy is exclusively among the next of kin.
It is not altogether that no person could be procured to administer upon the estate, agreeably to the laws in force; nor is there an allegation of equivalent import. And had there been, it does not appear, from the evidence, that it would have been true. The bill was premature, having been filed little more than three months after the intestate’s decease.
The Chancellor entertained a different opinion, and a long and expensive litigation is the consequence. Except as to the matter of costs, the cause, being here, *147 will be disposed of as though it were rightfully before the Court. The evidence shows, that about the year 1830, William Evans, the complainant, the intestate’s eldest son, left his father, and removed to the State of Indiana.. At that time, the father was in very embarrassed circumstances, largely in debt, his farm in a bad state of cultivation, the buildings dilapidated, and so unproductive, that he was obliged to work as a day laborer for the family bread. He was pressed for his debts, sued, and the impression of his neighbors, was, that the farm would be lost to him. In the year 1832 or 1833,. the respondents, Henry and James — the former a little over, the latter a little under, the age of majority — took charge of the farm, with their father, and managed it until 1839, when James married, and went away. Jonathan, the deceased brother, then went to the assistance of his father, and remained until March, 1842. From this time until the father’s death they lived with him, and took charge of his affairs. Much of the time they lived alone, with no other person upon the place. Both labored industriously. The father lacked thrift; the son was thrifty, as well' as industrious. Under the management of the’ young men, affairs assumed an improved aspect. The debts were not heard of. The farm was reduced to a high state of cultivation; lands cleared, fences built and repaired; meadows ditched and set in grass; new buildings erected, and various other improvements, indicative of permanent ownership, rather than temporary occupation. Their labor was abundantly rewarded, in the -increased productiveness of the soil, and the constant addition to *148 the stock. The farm was greatly enhanced in value. The increase of the stock was claimed by Henry; the notes taken and payments made for produce sold from the farm, generally went to him. It is evident, from the language of the witnesses, that their relation was neither that of landlord and tenant, nor that of employer and employe; but that of father and son, toiling together for a common purpose — the son anxious for the comfort of the father, the father quite as anxious for the .welfare of the son. One says: “I have often heard Henry?s .father, Evan Evans, tell Henry to work on and make what he could, that he should have it all.” Another says: “I heard the old man tell Henry, often, to work and make all he could, and that he should have it.” Others testify to the same effect, and we find in their evidence, this graphic picture : “I know that the old man and Henry had a good deal of wrangling; but it was just a sort of habit, and .1 do not think either of them meant any harm. They stuck together always. The old man was afraid Henry would get cheated, and Henry thought so of the' old man. Henry claimed the property, and the old man did not deny it was his; but both wanted to take care of the proceeds of the sales. The old man complained that Henry wanted to rob or cheat him. I never knew Henry to try to defraud his father. And in all their disputes, they remained particularly friendly and partial to each other.” Not long before the father’s death, one of his neighbors spoke to him on the subject óf a -Will, suggesting, “that he ought to give Henry what stock he intended him to have; for if he did not, Henry *149 would want to hold it all, and it would make a fuss. The old man replied, £Well, he ought to have it.’” The father appears to have been social in his habits— visiting the sick, staying with his children, and going on journeys. The son remained closely at home, almost a recluse. In his early days, a mental alienation of three or four years, had cast a- shadow over his whole life.
This part of the case has been examined with the more care, as our conclusions differ from those of the Chancellor. He ordered an account, as between landlord and tenant, charging rents and crediting improvements, computing interest from the end of each year. This brought Henry Evans in debt to the estate, the sum of $2,493.65, for which, with the entire costs, amounting, as taxed, to $455,581, a decree was pronounced against him, and a lien declared on his share of the estate. He prosecutes this writ of error as a pauper. Had the account been ordered, as between employer and employe, allowing Henry wages as a hireling, at the rate bis services, so regarded, are proved to have been worth, with interest from the end of each year, it would evidently have made the estate insolvent. To assume either hypothesis, is to make a contract for the parties, which the parties themselves never made. Indeed. it would be the merest accident, that any account between them, running back twenty-eight years, could attain justice. The father and son, in the absence of any proof to the contrary, must be held to have squared their accounts as they went, at least, to their mutual satisfaction; and having done so, the Court cannot disturb them.
*150 Much evidence is taken, and cost incurred, in investigating the estate of the deceased brother, Jonathan Evans. This ought not to have been allowed. Whatever personal effects he left, and he had no realty, belonged to his father, as next of , kin. It was done, however, and his entire estate is reported by the master, $4.50, in the hands of one of the complainants; and neither party excepts to the conclusion.
The hill seeks a collection of advancements, and an account was ordered and taken. The complainants suffer in the result, and, we are inclined to think, unjustly. But having neither appealed from the decree, nor excepted to that part of the Master's report, they are not in an attitude to admit of relief being granted.
There is also a prayer for a sale and division of the real estate. This is proper, and will he allowed. A good deal of testimony appears upon the inquiry, whether the land should be .specifically divided, or sold, and the proceeds divided. Without canvassing it, there can be little doubt that two hundred acres of land, provided with buildings, divided into fields of pasture, meadow, and arable, with wood and water, all convenient for use as a single farm, would be more valuable as a whole, than divided into five parts. Adjacent to a town, or for other purposes than agriculture, it might be different. The Chancellor’s decree, ordering a sale, will stand. An account will be taken of rents and profits, since the death of the ancestor up to the sale, regard being had to the disturbed condition of the country, and the profits actually realized. The entire cost of the cause, since the disallowing of *151 the demurrer to this time, will be paid by the complainants and their surety. The other costs, and such as may hereafter accrue, treating the proceedings as simply a bill for partition, will be paid from the estate. The cause is remanded for further proceedings.
The attention of the Court has been directed to the formidable bill of costs, appended to this record By far the larger' portion, $277.45, goes to the Clerk for his services. Of this considerable sum, $164.32, is set down to the single item of the report. While it is important to the due administration of justice, that the officers of the Court should be properly paid, so as to secure competency and fidelity in these useful and necessary agents of the law, it is equally important that parties compelled to assert their rights before the legal tribunals of the country, should be protected from imposition and overcharge. On examining this costly report, we find copied, by way of introduction, a voluminous interlocutory decree. This was wholly unnecessary. It was upon the minutes of the Court, for reference by the Chancellor. The original draft was, or should have been, in the file, for the use of the counsel. The Master was directed to take an account of the intestate’s property, on hand at the time of his death. He, properly enough, based his report upon the inventory and account of sales, filed by the administrator. But, instead of stating the result, and citing this paper, as the evidence to support it, as he ought to have done, the paper is copied at length into his report. He was also directed to report the just annual value of the farm rents. This could have been *152 done in a single short paragraph, giving the depositions on file, relied on by him, to sustain the report* Instead of this, the testimony of the witnesses is related, at great length, and then elaborately discussed. By these methods, and a great prolixity of statement, the report is swelled to more than thrice its due proportions..
The office of the Master is to inquire and report upon facts, not to decide — inquisitorial, rather than judicial. He is not a Vice Chancellor, nor are his duties those of the Master of the Bolls, under the English system. His conclusions have no validity whatever, until adopted and vitalized by decree of the Chancellor. Hence, arguments and processes of reasoning, are out of place in his reports; they should give- only results, stated clearly, succinctly, and intelligibly, with the proofs on which they rest — all else is superfluous.
It is proper to add, that the superfluous matter in. this report appears to be merely perfunctory, and not to have been intended designedly to aggravate the costs. If-it is deemed worth while to move for a revision of this bill of costs, the motion will be entertained*